[See Cases Nos. 6,981 and 6,982.]

## Case No. 6,981.

### HYLTON v. BROWN.

[1 Wash. C. C. 298.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1806.

ATTAINDER—PRODUCTION OF PAPER UNDER NOTICE—DISCOVERY—ADMISSION OF WILL IN EVIDENCE—HOW PROVED—RESIDENCE—TEMPORARY DOMICIL.

1. The operation and effect of the attainder laws of Pennsylvania.

2. It is premature, before the jury are sworn, and the trial commenced, for either party to call upon the other to produce a paper, which he has received notice to produce on the trial.

3. It is sufficient for one party to suggest that the other is in possession of a paper, which he has, under the act of congress, given him notice to produce at the trial; without offering other proof of the fact; and the party so called upon, must discharge himself of the consequences of not producing it, by affidavit, or other proof, that he has it not in his power to produce it.

4. The court will not, upon a notice of the defendant to the plaintiff, to produce a title paper to the land in dispute, which is merely to defeat the plaintiff's title, compel him to do so; unless the defendant first shows a title to the land.—Merely showing a right of possession, is not sufficient to entitle him to the aid of a court of chancery, or of this court, to compel a discovery of papers, which are merely to defeat the plaintiff's title, without strengthening the defendant's. It is sufficient, in order to entitle him to call for the papers, to show title to the land, although none is shown to the papers.

[Cited in Russell v. McLellan, Case No. 12,-158; Gregory v. Chicago, M. & St. P. R. R., 10 Fed. 531.]

5. Evidence of the political character and conduct of a particular person, was allowed to be given, in order to satisfy the jury, that he was not the person meant and intended by a proclamation, under the attainder laws; but not to impeach the attainder or confiscation of property; on the ground, that the person was not guilty of the crime imputed to him.

6. The copy of a will of land lying in Pennsylvania, made in New-York, proved before the surrogate of New-York, by one of the subscribing witnesses, who also proved, that the other two witnesses attested the same in the presence of the testator, the copy being authenticated under the seal of the surrogate's office, and entered in the register general's office in Pennsylvania; is not admissible in evidence, in the state of Pennsylvania.

7. In all cases, no matter where the will is made and proved, if it concern land in Pennsylvania, it must be proved by two witnesses.

8. What will constitute a residence, in contradistinction to temporary domicil.

[Cited in U. S. v. Penelope, Case No. 16,024.]

Previous to the jury being called to try this cause, the defendant read a notice to the plaintiff's counsel, to produce, at the trial, the will of Joseph Griswold, who, by deed, had leased the land in question to the plaintiff [the lessee of Hylton]; also, an affidavit, to prove that the original will was in the plaintiff's possession, by his own acknowledgment. It was objected, by the plaintiff's counsel, that the motion was premature, and should be made during the trial; because, the act of congress says, that the courts shall have power, in the trial of actions at law, on motion, and notice, to order papers to be produced, which contain evidence pertinent to the issue; so that the court, until the trial is gone into cannot know whether it is pertinent or not; and the order is to be made on the trial. The court overruled the motion. The jury being empannelled, the plaintiff deduced his title from the proprietors to Joseph Griswold; who, in the year 1789, leased the land in question to the lessor of the plaintiff, at a pepper-corn rent, for twenty-one years; but, to cease, and be void, on the lessor's conveying away the same by deed, or disposing of it by will. The defendant, after proving a possession for a number of years, renewed his motion for a production of Joseph Griswold's original will. To prove the land in possession of the plaintiff, he offered, only a copy of the will, proved in the surrogate's office at New-York, by one witness, and the payment of the expenses of probate, and an ex parte affidavit, to prove the plaintiff's acknowledgment that he had it. This latter was objected to, as the other party had no opportunity to cross examine.

BY THE COURT. The suggestion of the defendant is sufficient, without more, to authorize him to call for the production of the deed. If the possession is denied, the affirmative must be proved, to enable the party to derive any advantage from the non-production of it.

Upon this, the plaintiff gave the will to the court, and then insisted, that this was not a case in which, under the act of congress, they were compellable to produce the will. The words of the law are, that a party may be compelled to produce a paper, which contains evidence pertinent to the issue, in cases,

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

and under circumstances, where they might be compelled to produce the same, by the ordinary rules of proceeding in chancery. That, to enable the plaintiff to obtain this relief in equity, he must show a title to the thing. Whereas here, the defendant relies merely on possession. Cases cited; Finch, Prec. 36, 44; 1 Vern. 35, 479; 2 Vern. 50, 255; Mitf. Eq. Pl. 19, 50, 53, 68, 215; 1 Eq. Cas. Abr. 772.

The defendant replied, that possession was a sufficient title to authorize the interference of a court of equity.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

WASHINGTON, Circuit Justice. The remedy provided by the act of congress, is merely cumulative; and, to save the time and expense of a bill of discovery, it enables this court to do, in a summary way, what they might do, if a bill of discovery were filed on the equity side of the court, and no more. Now, if such a bill were filed, the court would not compel a discovery, unless the defendant showed a title to the land. A right of possession might protect the party in ejectment, unless the plaintiff can avoid it, and show a complete title in himself. But, this would not be enough to enable him to come into a court of equity, for a discovery of papers, which merely tend to defeat the plaintiff's title at law, without strengthening that of the plaintiff in equity. It is not alone necessary for the party applying, to show a title to the paper; for, if he show a title to the land, and the paper called for be necessary to its establishment, the court may relieve him; though, strictly, he has no title to the paper called for. At law, the defendant may not only shelter himself under his possession, without disclosing a better title; but, may do so by showing a subsisting title out of the plaintiff, and, consequently, out of himself. But, if in his bill of discovery he were to state this, or it was otherwise to appear, he could not be relieved.

The defendant then proceeded to show; that the land in question was confiscated, as the land of Joseph Griswold, distiller, late of the Northern Liberties of Philadelphia; and had been regularly forfeited under the laws of this state, and sold to persons, who sold and conveyed to Charles Thompson, under whom the defendant claims. This sale, and the conveyance from this commonwealth, took place in 1780. Having shown this title, the motion to produce the will of Joseph Griswold, was again renewed; but, the court was of opinion, that the defendant had no right to call for the will, which he does not pretend is necessary to strengthen his own title, but merely to defeat the plaintiffs.[2] The plaintiff's

counsel then proceeded to show, by evidence, that Joseph Griswold, under whom the lessor of the plaintiff claims, was not the person intended by the proclamation, but Joseph Griswold his son; by the examination of certain witnesses, who stated, that Joseph Griswold the father, always resided at New York, and only came here in 1775, and remained for about eleven months, to instruct his son in the art of distilling brandy. When the plaintiff's counsel were about to read certain depositions, to prove the political character and conduct of Joseph Griswold, during the war; the defendant's counsel objected, on the ground that the court and jury were precluded, by law of Pennsylvania, from inquiring into the guilt or innocence of the person attainted. The court observed, that the evidence now intended to be offered, was proper, not to authorize a decision against the confiscation and sale, on the ground, that the person was not guilty; but as a circumstance, combined with others, to satisfy the jury, that the person, whose estate had been sold, was not the person named in, or intended by, the proclamation. The defendant, after the testimony was gone through, offered in evidence a copy of Joseph Griswold's will; proved before the surrogate in New York, by one of the subscribing witnesses, who also proved that the other two witnesses attested the same, in the presence of the testator, authenticated by the seal of the surrogate's office. This was opposed, because the probate was not conformable to the laws of Pennsylvania. The act of 1705, declares, that all wills in writing, whereby any lands, tenements, or hereditaments, within this province, shall be devised, being proved by two or more credible witnesses, on their solemn affirmations, or by other legal proof in this province; or being proved in the chancery of England, &c. or being proved in the hustings' or mayor's court, in London, or in some manor court; or before such as shall have power in England, or elsewhere, to take probate of wills, &c. and a copy of such will, with the probate thereof annexed, being transmitted hither, under the public or common seal of the courts or offices where the same have been taken or granted, and recorded or entered in the register general's office in this province; shall be good, &c. to pass lands here, &c. This copy was entered in the register general's office here. The plaintiff's counsel contended, that by this law, the proof of the will, wherever made, must be by two witnesses; although it is not necessary that they should be subscribing witnesses; for such are the express words of the law; whereas, by the statute of frauds in England, where proof in the manner this will was proved, is allowed. requires only, that the three witnesses shall subscribe their names in the presence of the testator; but as to the mode of proof, it is left open to the common law rules, of prov-

---

[2] See Fonbl. 484, which fully supports the opinion of the court.

ing any written instrument. On the other side, it was insisted, that the fair construction of the law is, that if the will be proved in this state, there must be two witnesses; but if proved elsewhere, it is sufficient if it be proved according to the laws of the country where it is so proved.

Judge Peters, having consulted the late Chief Justice Shippen, and Mr. Chew, formerly president of the high court of errors and appeals in Pennsylvania, as to the common understanding and practice of the state, in this case (for there were no cases cited, but [Weston v. Stammers] 1 Dall. [1 U. S.] 2; [Morris v. Vanderen] Id. 66; and [Lewis v. Maris] Id. 278, 288,—which were not express, and Mr. Ingersoll and Mr. Lewis differed on the practice under the law), and being informed by them, that they never knew it questioned; but that in all cases two witnesses were necessary; the court informed the bar, that the will was not sufficiently proved, to authorize a copy of it being read in evidence. If the law had not uniformly received this construction in practice, and the common understanding of men, the correctness of it might have been doubted, in consequence of the repetition of the words "being proved;" which would seem to make each disjunctive part of the paragraph a new sentence, unconnected with the first, which prescribes the mode of proof in this state. Mr. Dallas commenced the summing up, and made two points: first, that Joseph Griswold the elder, was not intended by the proclamation; and second, that he was not sufficiently described. He relied on the evidence, which proved, that the father always resided in New York; was never here, but for eleven months, in 1775, and 1776, frequently within that time returning home; that he came here for a special purpose; that he never adhered to the enemy, but acted during the revolution as a peaceable citizen. That the proclamation describes him as being late of the Northern Liberties, in the county of Philadelphia, and state of Pennsylvania; whereas, he never was here, after Pennsylvania became a state, and never did inhabit the Northern Liberties at all. That this description fitted Joseph Griswold the son; of course the former could not have been meant, neither was he sufficiently described. Cases cited: Respublica v. Chapman, 1 Dall. [1 U. S.] 53; Buffington's Case [Id.] 60; 1 Wils. 164; 1 P. Wms. 612; Fost. 79; 1 Strange, 51, 60, 594; Salk. 6, 7; 2 Hawk. P. C. c. 46, § 4; Id. c. 23, §§ 120, 121; Id. c. 25, §§ 69, 70; 4 Burrows, 2563; Show. Parl. Cas. 50; 2 Hawk. P. C. c. 23, §§ 108, 120.

The court asked the plaintiff's counsel, after Mr. Dallas had finished, and one of the defendant's counsel had partly entered upon the argument, whether they meant to contend, that the act of the 31st of January 1783, which cured all misnomers and defects in prior attainders, was invalidated by the preliminary articles of peace; since, in the opening, this had been hinted at, and the foundation laid for the objection, by referring to the period at which the treaty was signed, made public, and ratified, in this country; but that no notice had been taken of it, in the summing up. That the validity or invalidity of that law, might have a material effect upon the decision of this cause. That this point was not decided in the case of Gordon v. Holiday [Case No. 5,610] at the last term; because, the day fixed for the appearance of Gordon being long after the preliminary articles were ratified, or acted upon, by our government, there was no necessity to decide it.

Mr. Dallas, to prove that the treaty was complete before the passage of this law, and consequently avoided it, laid down the rule; that unless it be postponed till the ratification, it takes effect from the signing; it is binding on the governments from that time, though not on individuals, till made public. He cited Vatt. Law Nat. bk. 4, c. 3, p. 647, § 24; Id. bk. 2, c. 12, §§ 156, 157; Mart. Law Nat. 332; Grot. bk. 2, c. 11, § 12; Park. Ins. p. 75; Case of The Mentor, 1 C. Rob. Adm. 181; 4th January, 1784, congress recommending to the states the restoration of confiscated estates, between the 30th November, 1782, and the ratification of the treaty; 3 Gord. Hist. 302. Correspondence between Mr. Jefferson and Mr. Hammond, pp. 13, 15, 24, 28, 29, 41, 48; Vatt. Law Nat. bk. 3, c. 16, §§ 6, 33, 339.

The Attorney General, and Mr. Ingersoll, for defendant, contended: 1st, that the father was meant, and intended in the proclamation, and relied upon his political character; his having an estate here; the petition of the son, and the claim of the brother; the subsequent arrest and discharge of the son, which could not have happened if he stood attainted, &c; the long acquiescence of the father, since the sale; his not being called junior: and cited 2 Hawk. P. C. c. 23, § 106; Hob. 330; that where there is father and son of the same name, and the son is called upon, the addition is necessary: 2d, that he is properly described in the proclamation; that he boarded in the city; he was conversant in the Northern Liberties, for there he carried on business. Barnes, Notes Cas. 162. He may be styled of the parish he is in, or where he is conversant. 4 Bl. Comm. 407, 431. They cited the following cases: [Respublica v. Sweers] 1 Dall. [1 U. S.] 44; [Camp v. Lockwood] Id. 403; 1 Bl. Comm. 48, 49; 2 Wood. El. Jur. 621; Strange, 924. They contended; thirdly, that the question, under the act of 31st of January, 1783, is, was the father meant and intended to be named in the declaration; and that this law passed, prior to the operation of the treaty of peace; and if afterwards, still it is not in contravention of it. That the provisional articles were to depend upon a treaty being made between Great Britain and

France; which, though signed on the 20th of January, 1783, were not ratified till the 3d of February, after the passage of this law; and that its taking effect, was made, by the terms of it, to depend upon the ratification. That this appears from the periods fixed for the performance of certain acts, all of which are dated from the ratification; and to prove this, the Annual Register for 1783, was cited, page 12, 14. That such a clause is inserted in all modern treaties. 1 Ves. Jr. 392. That the opinion of our own government was, that the treaty between Great Britain and the United States, did not take effect till 11th of April, 1783. Correspondence between Mr. Jefferson and Mr. Hammond, pp. 41, 53, 88, 93, 105. In answer to a point, which plaintiff's counsel stated they should press, that the attainder was illegal, they contended, that it was too late now, and in this collateral way, to dispute it. That it must be considered, that Joseph Griswold had committed treason, by adhering to the enemy within this state; because, it is so stated in the proclamation, which became a sentence or conviction by his non-appearance. That the act of 1783 was not a law of confiscation, but merely a confirmatory law, and therefore not contraventive of the treaty. But if it were, still, the act of the 29th of March, 1779, protects the rights of the purchaser; though the attainder should be avoided, for error or any other cause whatever, except as to a paramount title. But the plaintiff's is not such an one; because he claims under Joseph Griswold, the father, who was attainted, and his estate sold.

Lewis, in reply, answered all the points made by the defendant, and pressed the one of which he gave notice, viz. that the forfeiture is made the consequence of the attainder, and consequently, if that attainder be invalidated, the forfeiture cannot· be supported. The executive council acted upon a delegated authority, which was, to call upon all persons by name, inhabitants of this state, or who had real estate here, and who now do, or hereafter may, adhere to the enemy, by joining their armies. &c.; not those charged with doing these things. To support this attainder, then, it should appear, that Joseph Griswold, the father, did, then or thereafter, adhere, &c.; the contrary of which appears by the evidence. In England, in cases of this kind, the greatest strictness is used, in requiring proof of every thing necessary to give validity to the attainder. Harvey's Case, Fost. Crown Law, 51.

WASHINGTON, Circuit Justice (charging jury). This is a cause of consequence, and attended with considerable difficulty. It has been argued with great ability on both sides. Many preliminary questions have been discussed, and disposed of; by which means it will now be presented to the jury, narrowed down to a single point. You will dismiss from your minds, every attempt which has been made to enlist your passions, on either side, by the supposed hardship which the plaintiff or defendant may be exposed to, by a verdict unfavourable to his pretensions. To correct minds, appeals of this kind, if they disgust not, can never be successful. We must ascertain the material facts in the cause, and the law applying to them; and then declare the result, let that be what it may. As to Mr. Thompson, who, it is argued, will be without redress, should he now fail, it seems to be agreed. that if the plaintiff recovers by a title paramount to the attainder, that the door is left open for him to ask and receive compensation from the state. The court· admit the right of the state of Pennsylvania to confiscate the estates not only of its own citizens, but of non-residents who failed to surrender themselves, in conformity with the requisitions of the law of March, 1778; and we mean to enforce that authority, and the subsequent laws, according to the true intent and meaning of them; unless we should be of opinion, that any of them are abrogated by some superior law.

The facts in the case, and which seem not to be disputed, are as follows: Joseph Griswold, the father, whose land was seized and forfeited, always, from the moment we hear any thing of him, lived in the state of New York; was a married man, and a father. He carried on his trade, which was that of a distiller, in the city of New York, from the year 1759, and before, until about the year 1776; when he left that city, and retired with his family to his country residence on Long Island. Having a son also named Joseph, whom he wished to instruct in the same trade, and to establish in business, he came to Philadelphia in the summer of 1775, unattended by his family, bringing this son with him: in pursuance of this, the primary and sole object of this visit, he rented a distillery in the Northern Liberties, which, until the spring of 1776, was conducted under his ·name; at which place the son received that instruction, which enabled him afterwards to carry on a distillery upon his own account. The father, during the whole of the time that he continued in Philadelphia, was a boarder in Strawberry alley, within the limits of the city, where he lodged and took his meals, spending much of his time at the distillery, where his business required his presence; in the space of ten or eleven months that he was so employed, he returned three times to New York, to visit his family, no part of which (his son excepted), ever came to Philadelphia, to remain or to live with him. In April or May, 1776, having accomplished the business which brought him here, he left Philadelphia, and never returned again into the state, to the knowledge of any one of the numerous witnesses who have been examined. His political character was that of a loyalist, although it does not appear that he ever was guilty of a single overt act, resembling treason against his country. He

was nevertheless arrested upon suspicion, by order of the commander-in-chief, and sent to Connecticut; where, after remaining three or four months, he was permitted to return to his family on Long Island, under parol of honour, to behave himself as a good citizen during the war. This promise, it does not appear from any witness, he ever violated. He continued quiet, inactive, and inoffensive, during the rest of the war, so far as we have received information respecting him, from the witnesses. We know much less of the history of his son. He continued to live in Philadelphia, after the departure of his father; and at different periods rented two distilleries in the city of Philadelphia, where he carried on the trade in which he had been instructed; not as an apprentice, but as a principal distiller. Whether he lived in the city, or Liberties, does not appear; but we find that he married in Philadelphia, some time in the year 1777; that he continued his residence in this place, until the approach of the British army. He went off in American uniform, and became a resident of the state of New Jersey. He was reputed a whig; yet we find, in November, 1780, that he was apprehended by a warrant from the supreme executive council of this state, upon a charge of having been guilty of traitorous practices; and in December of the same year, after a short confinement, was discharged. He was in a few days after again apprehended, upon a charge of treason, and again discharged, upon security for his good behaviour during the war. In March, 1778, the law passed, authorizing the supreme executive council of this state, to issue a proclamation, calling upon all persons, inhabitants of this state, or who have real estates within the same, and who now do, or shall hereafter adhere to the enemy, and join their armies; to surrender themselves on or before a certain day, before some magistrate of the state, and abide their legal trial, under pain of standing attainted, and forfeiting their estates as in cases of treason; and pointing out the mode of selling their estates. On the 22d of June, 1778, a proclamation issued, calling upon certain persons, by name, to surrender themselves, on or before the 5th of August following; and amongst others, "Joseph Griswold distiller," who is described as being "now, or late of the Northern Liberties township, and county of Philadelphia," and late or heretofore an inhabitant of this state, is named. No person answering to that description having appeared on the day fixed, the lands of Joseph Griswold the father, and amongst others, the land in question, was seized by the officers of government. Joseph, the son, hearing of this, presented on the 16th of August, 1778, a petition to the supreme executive council, praying for a pardon of his father, and assigning many reasons why it should be granted. Upon the report of Mr. Isham, to whom the petition was referred, unfavourable to the prayer, it was

rejected, and the land was sold on the 21st of June, 1780, to certain persons from whom Mr. Thompson afterwards purchased. In August, 1780, Thomas Griswold, the brother of Joseph, the father having a subsisting term in the lands in question, laid his claim to the same, before the proper tribunal.

These are all the important facts in the cause, and it now becomes necessary to state the question which is to be decided. But previous to doing this, we must give an opinion upon certain legal points, which have been discussed, and which if determined in one way or the other, will most materially affect the question which you are to consider.

1st. What is the operation of the law of March, 1779, upon the rights of the plaintiff and defendant? 2d. Is the law of the 31st of January, 1783, inoperative or not, on account of the treaty of peace?

First. The sixth section of the act of 1779 declares, that if any attainder be reversed, or made void for error, or for any other cause whatever, it shall not operate against a bona fide purchaser, but against the state only; and the purchaser shall hold the lands discharged of all claims (other than those mentioned in the 8th section), and the injured party shall be indemnified out of the public treasury. The 8th section declares, "that nothing in this act, shall debar any person, but him who claims under the attainted traitor, from pursuing his remedy to recover his land, as if this law had never been passed."

It is contended, that the lessor of the plaintiff, claiming under Joseph Griswold, the father, who was attainted, and his land seized and sold; is barred of all remedy against the purchaser, and must seek indemnification from the state. This argument is built upon a begging of the question. The defendant asserts, that the father was the person attainted, which the lessor of the plaintiff denies. If the 6th section had stood unqualified, the argument would have been entitled to more consideration. But, the plaintiff claims the benefit of the exception; and if he brings himself within it, he is entitled to its protection. It is no argument, to say, that he is not within the exception, because the land of the father was seized and sold; for if this kind of reasoning would do, there could be no case on which the 8th section could operate. The case then stands precisely as it would have done, as to the point in dispute between these parties, if the 6th section had not been inserted.

Secondly. The next question respects the validity of the act of January, 1783, and we are to examine it in two points of view. 1st. Was it passed posterior to the treaty of peace, so as to be affected by it? And 2d, are the provisions of it, or any of them, a contravention of the treaty?

1st. The provisional articles of treaty were signed on the 20th of November, 1782; and the ministers who formed that treaty declared, "that the articles then agreed

upon, are to be inserted in, and to constitute the treaty of peace, proposed to be concluded between the two governments; but which is not to be concluded, till terms of peace are agreed upon between Great Britain and France; and Great Britain should be ready to conclude the same." These articles, then, did not merely form the basis of a treaty, subject to future modifications, but it was the treaty itself, agreed upon at the time it was signed; postponed only in its operation, until terms should be agreed upon between Great Britain and France, and Great Britain should be ready to conclude the same. So perfectly was this understood, that the definitive articles do not differ in any respect from those agreed upon at this time. On the 20th of January, 1783, terms of peace were agreed upon between Great Britain and France; the preliminary articles being signed, by the respective ministers of those governments, on that day. But it is contended, that this treaty can only be considered as made on the 3d of February following, when it was ratified; and in support of this opinion, it is stated, that, by its terms, it was suspended till ratification.[3] No evidence of this has been given; and from the substance of these preliminary articles, as detailed in the Annual Register for 1783 (for we have not seen the treaty itself), there is no reason to suppose, that this was the case. Certain days are fixed upon for the performance of certain things, most of which are to count from the ratification of the treaty. But this does not prove the fact, any more than it proves that the provisional articles between Great Britain and America, were suspended until the ratification; for the same provisions are made in that treaty, in the sixth article; and are common in all treaties. But even if this were the fact, as to this treaty; we do not think it would affect the case, because, when ratified, the treaty would relate back to the signing. The ratification is nothing more than evidence of the authority under which the ministers acted; and Vattel says, "that a government is bound to perform and observe a treaty, made by its minister, unless it can be made to appear that he exceeded his authority." But a ratification is an acknowledgment that he was authorized to make the treaty; and if so, the nation is bound, from the time the agreement is made and signed. I am constrained, then, to say, that terms of peace were agreed on between Great Britain and France, on the 20th of January, and consequently that the contingency, on which the treaty between Great Britain and the United States, was to take effect; happened on,

and was binding upon, the two nations, from that day, if no sooner. Consider this case upon the reason and honesty of it. Great Britain, in the four first articles, makes what were deemed concessions on her part; in consideration of which, the United States stipulated to recommend to the states, restitution of confiscated estates, and engages, that no future confiscations should be made. Would it have consisted with good faith, that she should, during the suspension of the treaty, have produced, in the worst, a confiscation, so as to destroy the consideration which induced the stipulation on the part of Great Britain? Certainly not.

The opinions of our government on this subject, have been relied upon by both sides; and, the letter of Mr. Jefferson to Mr. Hammond, has been read in detached parts, to support the pretensions of the plaintiff and defendant. But, really, that letter has been so garbled, that it is impossible, without reading it throughout, to say which side can safely claim an advantage from it. I once read, approved, and admired it; but, I cannot recollect the course of argument upon this particular subject. Be this as it may, I have no hesitation in saying, that I cannot yield my own opinion, when coolly and deliberately formed, to that of any member of the government, not carrying with it the force of a law. Upon the whole, then, it is the opinion of the court, that the law of the 31st of January, 1783, is posterior to the treaty of peace, which is the supreme law.

The next question under this head is, does that law contravene the treaty of peace? The treaty declares, there shall be no future confiscations. The confiscations which had taken place, before the 31st of January, 1783, were complete and valid; or, they were not. If valid, then this law was inoperative and unnecessary: if not, then this law, by giving them validity, produces the confiscation, and is, therefore, a breach of the sixth article.

I come now to the question, which is, not whether Joseph Griswold, the father, was the person meant and intended by the proclamation; which would have been the proper question, had the act of the 31st of January, 1783, passed before the treaty took effect, and might have been a very perplexing question for the jury; but, is Joseph Griswold, the father, the person named in the proclamation? Was he truly described in it? This was the question in Lord Pitsligo's Case, Fost. Crown Law, 79, and in Buffington's Case [supra]. If Joseph Griswold, the father, had been apprehended after the 5th of August, and a suggestion filed against him, similar to that in Buffington's Case, and the same plea had been put in; would the jury have said, that he was the person named in the proclamation? If they would not, neither ought they, in this case;

---

[3] In the preliminary articles between Great Britain and Holland, this is expressly stipulated, viz. that as soon as they shall be signed and ratified, there shall be sincere friendship, etc. between the two nations, etc.

where the question, in fact, is the same, as affecting the forfeiture of his property. For, though we do not mean to decide upon the last point made by Mr. Lewis, because we deem it unnecessary; yet, we have no hesitation in saying, that the forfeiture, in this case, was the consequence of the attainder; and, if the latter cannot be supported, neither can the former. To determine, whether he is the person named in the proclamation; we must attend to the description. He is called, "Joseph Griswold, distiller." This is true, as to him; and equally so, as to his son. Perhaps he might be said to be of the Northern Liberties, since he carried on his business there; but, upon this point, we give no opinion; at the same time, if the description suited him, it also suited the son. He is described as being late, or heretofore, an inhabitant of this state. Now, this is not true. He never was an inhabitant of this state or province. He always resided and inhabited in the state of New-York, where he kept house, and had a family, which always remained there: He came to Philadelphia, and remained for a few months, for a special purpose; visited his family three times; and, having accomplished the business which occasioned this temporary visit, he returned to his dwelling in New-York, and to his family. His whole conduct furnishes complete evidence, that the animum revertandi always continued. He was no more an inhabitant of this state than I am, who spend one-third of each year in this city; or any other person, who comes here to transact a certain piece of business, and then returns to his family. This is not a captious objection. The falsity in the description, is important, in two respects. First, two classes of persons are contemplated by the law of 1778; viz. those who resided in the state, and owed allegiance to it; and those who lived out of the state, but who had real estate here. If the latter were intended to be named in the proclamation, they should have been described, either as inhabitants of the state in which they lived, or as having real estate here. In the next place, the description completely fitted Joseph Griswold, the son, in all respects; but, was repugnant to truth, as it respected the father, who never was an inhabitant of this state.

In the execution of a law so highly penal as this, the principles of law and of eternal justice required, that the person called upon to surrender himself, should be described with such certainty, that he might have notice, and be enabled to appear, and prove his innocence; if he could do so. Who will be found bold enough to vindicate the doctrine of taking away life and property, for an alleged crime, without giving an opportunity to the accused to be heard in his defence? And where is the difference between a notice, containing a false description, and the total want of notice? In Buffington's Case, the plea was supported. though the description used in the proclamation, could fit no other person. This case happened, flagrante bello, during the heat and fury of the Revolution; and shall we, at this day, be less humane or less just? God forbid! Upon the whole, then, we are of opinion, that, if you believe the facts, as above stated, and there is no conflicting evidence in the cause; then Joseph Griswold, the father, was not truly described, and was not the person named in the proclamation; and, consequently, your verdict ought to be for the plaintiff.

The jury were kept confined for six days and nights; and then found a special verdict, which was set aside.
[See Cases Nos. 6,980 and 6,982.]